**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ELIZABETH GARCIA, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:19-CV-1016 (JCH) |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, COMMISSIONER | : | |
| OF SOCIAL SECURITY | : | SEPTEMBER 8, 2020 |
| Defendant. | : | |

**RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER (DOC. NO. 13) AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER  (DOC. NO. 15)**

## I.      INTRODUCTION

Plaintiff Elizabeth Garcia ("Garcia") brings this action under title 42 of section 405(g) of the U.S. Code, appealing the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Supplemental Security Income ("SSI").  See Compl. (Doc. No. 1).  Garcia moves the court for an order reversing the decision of the Commissioner.  Mot. for Order ("Pl.'s Mot.") (Doc. No. 13). The Commissioner cross-moves for an order affirming that decision.  Mot. for Order Affirming the Comm'r's Decision  ("Def.'s Mot.") (Doc. No. 15).

For the reasons stated below, the court vacates the Commissioner's decision and remands for further proceedings, thereby denying the Commissioner's Motion for an Order Affirming the Commissioner's Decision and denying in part Garcia's Motion for Order, insofar as Garcia's Motion seeks a reversal of the Commissioner's decision.

II.    **BACKGROUND**

A.    <u>Facts</u>

Garcia, who was born on January 17, 1968, last completed work constituting substantial gainful activity in 2008.  <u>See</u> Admin. Record ("AR") (Doc. No. 10) at 92, 301. In this Action, she identifies multiple physical and mental impairments that she claims prevent her from engaging in substantial gainful activity.

1.    Physical Impairments[1]

On June 27, 2014, Dr. Sultan Quraishi of the Family Medicine department at Silver Lane Medical Center recorded Garcia's complaint of "[a]ches and pains all over the body."  AR at 1021.  Dr. Quraishi provided Garcia with educational materials concerning fibromyalgia and recommended that Garcia see a physiatrist.  AR at 1022.

X-rays of Garcia's shoulders and right knee conducted on November 24, 2014 indicated "[m]ild degenerative changes" in her right knee and no fractures, dislocations, or degenerative changes in her shoulders.  AR at 454-56.

At an appointment on November 25, 2014, Dr. Quraishi diagnosed Garcia with osteoarthritis.  AR at 1024.  He provided Garcia with educational materials, ordered x-rays, and prescribed Gabapentin.  AR at 1024.  Dr. Quraishi also listed osteoarthritis as a diagnosis at a subsequent appointment on April 1, 2015.  AR at 1027-30.

X-rays of the cervical and lumbar portions of Garcia's spine conducted on February 17, 2016, revealed "[p]robable congenital incomplete segmentation at

---

[1] Garcia submitted materials from several sources regarding multiple physical impairments.  The court recounts those portions of the record necessary to address the issues raised in the instant Motions.

[vertebrae] C6-C7 with mild superimposed cervical spondylosis", as well as lumbar spondylosis.  AR at 457-60.  X-rays of Garcia's shoulders also conducted on February 17, 2016, uncovered "[m]inimal degenerative arthritis in the right glenohumeral joint."  AR at 461.  An MRI of Garcia's lumbar spine conducted on November 17, 2016, indicated mild facet hypertrophy at multiple vertebrae, levoconvex scoliosis, a minor disc bulge, and an asymmetric left-sided disc osteophyte complex which appeared to contact a nerve root.  AR at 561-62.  An MRI taken of the same area on July 27, 2018, produced similar findings, namely that Garcia suffers from a "[s]table asymmetric left-sided disc osteophyte complex, abutting the exiting left L5 nerve root", as well as "minor spondylosis without neural impingement" elsewhere in her spine.  AR at 567-68.

On October 3, 2016, Dr. Robert Dodenhoff, M.D., conducted a consultative evaluation of Garcia in connection with her application for benefits administered by the Connecticut Department of Social Services ("DSS").  AR at 552-53.  Dr. Dodenhoff included in his observations that Garcia walked with a "slight limp", that her thyroid glands presented "mild bilateral fullness", that her grip strength and fine and gross manipulation with her hands were within a normal range, and that Garcia exhibited crepitance in both her knees.  AR at 552-53.  He also noted that Garcia did not use any assistive devices.  AR at 553.  He concluded that Garcia "is able to: sit, stand, walk, [and] lift, carry[,] and handle objects."  AR at 553.

Garcia was referred to physical therapy at UConn Health in July 2018.  See AR at 691.  An intake report, dated July 23, 2018, notes that Garcia recounted a "greater than 10 year history of bilateral low[er] back pain with intermittent left lower extremity radiculopathy in a nonspecific dermatomal pattern."  AR at 693.  The intake report also

states that Garcia, at that point in time, "never had any follow-up treatment" after her 2016 MRI, aside from "recent initiation of chiropractic care" and use of Advil and Tramadol.  AR at 691.  A report from a follow-up physical therapy appointment on August 3, 2018, notes that Garcia described "severe bilateral back pain" but "did take ibuprofen and today feels a bit better."  AR at 729.  The physical therapy report also indicates that Garcia was continuing "with chiropractic care, and chooses to continue this care in place of physical therapy at this time."  AR at 729.

Consistent with this note, the record reflects that Garcia sought out chiropractic therapy regularly during this general time period.  See, e.g., AR at 756-58.  A representative report from Garcia's chiropractor Yojana Shahi dated October 2, 2018 indicates that Garcia experienced tenderness, limited range of motion, and pain throughout her back and shoulders.  AR at 747.  Shahi used manual therapy techniques to treat Garcia and instructed Garcia to perform therapeutic exercises at home.  AR at 748.  Other treatment modalities at chiropractic therapy sessions included electric stimulation therapy and ultrasound therapy.  See, e.g., AR at 660, 766.

On September 6, 2018, Garcia met with Physiatrist Durgadas Sakalkale, M.D., who recorded Garcia's report that her "level of pain ranges from 5-8 out of 10" and was "aching and throbbing in nature."  AR at 907.  Dr. Sakalkale listed as diagnoses: lumbar spondylosis, spondylosis with radiculopathy in the lumbosacral region, spinal stenosis of lumbar region, degeneration of lumbar intervertebral disc, and lumbar radiculitis.  AR at 909.

Dr. Sakalkale also wrote that "[m]ost of [Garcia's] pain is located in the lower lumbar region rating [sic] to both buttocks left worse than right with pain at times

4

radiating to posteriolateral aspect of left thigh and leg which is worse on standing and walking and also on lying down on the left side."  AR at 907.  Additionally, Garcia told Dr. Sakalkale that "[s]he has intermittent feeling of numbness in legs but denies any weakness."  AR at 907.  When Dr. Sakalkale examined Garcia, he observed that "[s]he appears to be in no pain" and that "[h]er gait is normal and appears pain-free."  AR at 908.  With respect to Garcia's back and spine, he noted "[m]ild to moderate midline and left-sided paraspinal tenderness [ ] over the lumbosacral spine at lumbosacral junction."  AR at 908.  Dr. Sakalkale reported "[n]o instability" in Garcia's hip joints and knees.  AR at 909.

Dr. Sakalkale recommended "conservative treatment options including medications [and] physical therapy, as well as interventional pain management techniques such as epidural steroid injections/facet joint injections to further optimize pain relief."  AR at 909.  He suggested "follow-up in 1-2 weeks for this [sic] scheduled epidural steroid injections and follow-up thereafter for further review."  AR at 909.  An after-visit summary from UConn Health indicates that Dr. Sakalkale administered the injections on September 12, 2018.  AR at 743.

Garcia also submitted evidence related to thyroid disorders.  On April 18, 2017, Garcia was diagnosed with subclinical hypothyroidism.  AR at 916.  On February 1, 2018, a thyroid imaging scan indicated hyperthyroidism and Plummer's Disease.  AR at 739-40.  A week later, on February 8, 2018, Garcia was prescribed Methimazole.  AR at 828.  A report dated May 24, 2018, indicates that Garcia had been instructed to follow up with the UConn Health Endocrinology Department for an ultrasound and possible biopsy "about four months ago . . . but never did."  AR at 975.

5

2.    Mental Impairments

Garcia submitted voluminous records documenting her history of mental illnesses, including schizophrenia, depression, and PTSD.  These records indicate that Garcia has been prescribed medications and therapy for these conditions since at least March 2015.  See AR at 439.

Of particular importance to the current case, and representative of Garcia's reported symptoms, is a questionnaire dated April 21, 2016, signed by Teodoro Diaz, MSW, LCSW, and co-signed by Tess Kryspin, M.D.  AR at 514.  The questionnaire indicates that Garcia was first seen for treatment on October 6, 2015, and returned for biweekly visits thereafter.  AR at 510.  The questionnaire lists as diagnoses PTSD and schizophrenia, and reflects that Dr. Kryspin prescribed the medications Seroquel and Lexapro.  AR at 510.  The questionnaire also indicates that Garcia "responded well" to a combination of talk therapy and medications.  AR at 510.

With respect to Garcia's symptoms, the questionnaire reports a "[h]istory of visual/auditory hallucinations associated with being attacked", as well as hypervigilance.  AR at 510-11.  Section 7 of the report, which pertains to Garcia's "current mental status" indicates that Garcia appeared "casual, neat and appropriate" and that her cognitive status was "oriented" with respect to orientation, memory, attention, and concentration.  AR at 511.  This section also notes that Garcia "heard voices and [experienced] visual illusions of a man" that very morning, and that her mood was "anxious" and her affect "blunt."  AR 511.  The report indicates that Diaz was responsible for "mental status or psychological testing" associated with Section 7.  AR at 511.

6

Sections 8 through 10 rate Garcia on a scale of 1 (always a problem, or no ability) through 7 (excellent ability, never a problem) for activities of daily living, social interactions, and task performance.  AR at 511-13.  The questionnaire indicates responses of 4 (average ability/functioning in this area) through 7 for activities of daily living, with the exception of a rating of 3 (sometimes a problem, or reduced ability) for "handling frustration appropriately."  AR at 512.   For social interactions and task performance, the questionnaire rated Garcia as 2 (frequently a problem, or limited ability) or 3 for all but one category.  AR at 513.  Garcia received ratings of 2 for the following social interactions and task performance categories: "getting along with others without distracting them for exhibiting behavioral extremes"; "focusing long enough to finish simple activities or tasks"; "performing basic activities at a reasonable pace"; and "ability to persist in simple activities without interruption from psychological symptoms." AR at 513.

Sections 8 through 10 of the questionnaire each included a space prompting the completing provider to "explain any [activities of daily living/social interactions/task performance] issues[.]"  AR at 512-13.  These spaces were left blank.  AR at 512-13.

On the final page of the questionnaire, Diaz's name and signature appear on the signature line.  AR at 514.  Below that line, a notice states: "if you are not an MD, DO or a licensed psychologist, please have this report co-signed by the supervising MD, DO or psychologist, if possible.  AR at 514.  Dr. Kryspin's name and signature appear on the line below, with "Co-Signature" printed beneath her signature.

Diaz also completed a report, dated June 4, 2018, in connection with Garcia's application for benefits administered by the DSS.  AR at 702-08.  In the report, Diaz

indicated "Yes" in response to a prompt asking whether "this condition, or combination of conditions, prevent[s] the patient from working at this time[.]"  AR at 703.  With respect to symptoms and clinical findings, the report lists auditory and visual hallucinations, poor mood, flashbacks, night terrors, and hypervigilance, and avoidance of stimuli brought on by schizophrenia and PTSD.  AR at 703.  The report also notes "past inpatient hospitalization in Puerto Rico" and states that treatment, including art therapy, "has been able to prevent rehospitalization."  AR at 703.  The report also indicates that Garcia experienced recurrent psychotic symptoms and that loud noises "serve as a trigger for both psychological disorders."  AR at 704.

In a section concerning Garcia's "ability to perform [physical functions] during an 8-hour workday with normal breaks[,]" Diaz selected "Never" for sitting, standing, and walking.  AR at 705.  Further, Diaz indicated that Garcia's symptoms would "likely [ ] be so severe that they may interfere with attention and concentration needed to perform even simple work tasks" for more than 25% of a typical workday.  AR at 706.

The treatment reports Garcia submitted in connection with her mental impairments indicate that Garcia met with Diaz for one-on-one therapy sessions, with the stated goals of "avert[ing] psychiatric hospitalization" associated with schizophrenia and "reduc[ing] the severity of trauma" associated with PTSD.  See, e.g., AR at 780-83. Therapeutic techniques included having Garcia engage in art therapy by painting and designing T-shirts.  AR at 782.

In her testimony before the ALJ, Garcia recounted a history of severe abuse related to her diagnosis of PTSD.   Specifically, Garcia testified that she suffered abuse at the hands of relatives and intimate partners, including being molested by an uncle

8

and stabbed by her ex-husband.  AR at 101-02.  Additionally, Garcia explained in her

testimony that her auditory hallucinations take the form of voices urging her to commit

acts of violence.  AR at 119-27.

On October 4, 2016, Licensed Clinical Psychologist Lashanda B. Harvey, Psy.D.,

conducted a consultative evaluation of Garcia in connection with Garcia's application for

benefits administered by DSS.  AR at 557-59.  Dr. Harvey's report in connection with

the evaluation listed as diagnoses "schizophrenia, paranoid type" and "alcohol use

disorder, sustained full remission", but Dr. Harvey listed PTSD as a "rule out" diagnosis.

AR at 559.  In a narrative section labeled "Diagnostic Impressions", Dr. Harvey wrote

the following:

> [Garcia] was cooperative with the current mental status evaluation.  She is
> viewed as a reliable informant of information.  She would likely be unable to
> manage her own benefits.  Her clinical picture reflects a persona with marked
> peculiarities in thinking and experiences, often associated with an active
> psychotic episode.  She describes a level of suspiciousness and mistrust that is
> associated with prominent paranoia of delusional proportions. Her social
> judgment is probably fairly poor.  She is likely to be quite emotionally labile in
> which she is primarily irritable, manifesting episodes of poorly controlled anger.
> Her behavior is likely to be self-destructive and impulsive.  Her life is probably
> constricted by her psychological turmoil.

AR at 559.

B.    Procedural history

On March 23, 2016, Garcia submitted an application for SSI benefits,

alleging an onset date of January 1, 2000.[2]  See AR at 159, 301.  Garcia later

---

[2] Garcia previously filed an application on July 22, 2014, which was denied via an initial
determination on June 30, 2015.  AR at 40.

amended her alleged onset date to March 23, 2016.  See AR at 86.  In her application, Garcia cited as causes for her claimed disability anxiety, depression, schizophrenia, PTSD, hyperthyroidism, Plummer's Disease, rheumatoid arthritis, chronic pain, degenerative disc disease of the cervical and lumbar spine, and degenerative joint disease of the knee, shoulder, and hip.  See AR at 40.

In a Disability Determination dated October 12, 2016, the SSA determined Garcia to be not disabled.  AR at 159-68.  Garcia filed a request for reconsideration on December 19, 2016, and that request was denied on April 21, 2017.  AR at 179.  On June 27, 2017, Garcia filed a request for a hearing.  AR at 182.

On October 4, 2018, Administrative Law Judge John Aletta ("the ALJ") conducting a hearing at which Garcia appeared with counsel and testified.  AR at 77-142.  Garcia's testimony included statements that her physical ailments make it difficult for her to bend over, stoop, crouch, or lift heavy objects; that she has trouble concentrating on tasks for more than approximately 15 minutes at a time; that she suffered abuse at the hands of relatives and intimate partners, including being molested by an uncle and stabbed by her ex-husband; and that she experiences auditory hallucinations in the form of voices urging her to commit acts of violence.  AR at 101-02, 119-27.  A vocational expert ("VE") also testified at this hearing.  AR at 129-41.

On November 2, 2018, the ALJ informed Garcia of his decision finding her to be not disabled.  AR at 10-33.  At step one of the ALJ's analysis, he determined that Garcia has not engaged in substantial gainful activity since March 23, 2016,

Garcia's amended alleged onset date.  AR at 18.  At step two, the ALJ found that

Garcia suffers from the following severe impairments: "schizophrenia, anxiety,

depression, post-traumatic stress disorder, dysthymic disorder, degenerative disc

disease of the lumbar spine, spondylosis of lumbar spine[,] and spondylosis of

cervical spine with congenital incomplete segmentation at C6-7."  AR at 18.

At step three, the ALJ determined that Garcia's impairments, singularly or

in combination, did not meet the severity of a listed impairment in Appendix 1 to

subpart P of part 404 of title 20 of the Code of Federal Regulations.  AR at 20.  In

reaching this conclusion, the ALJ specifically referred to section 1.04 (spinal

disorders) and listings 12.03, 12.04, 12.06, and 12.15 (mental impairments).  AR

at 20.

At step four, the ALJ determined that Garcia has the following residual

functional capacity (RFC):

> [Garcia] has the residual functional capacity to perform medium work as
> defined 20 CFR 416.967(c) with the following additional limitations: She
> can frequently climb ramps/stairs, occasionally climb ladders, ropes and
> scaffolds, frequently balance, stoop, kneel, and crouch and occasionally
> crawl.  She cannot work at unprotected heights.  She can perform simple,
> routine tasks but not at a strict, production rate pace and can execute
> simple, routine instructions.  She can make simple, work related decisions.
> She cannot work with the general public and can occasionally interact with
> co-workers and supervisors but cannot engage in tasks requiring
> collaboration with co-workers.  She can tolerate occasional changes in her
> work setting and work procedures which are simple and routine in nature,
> and can make simple, routine work plans.

AR at 21.  In constructing the RFC, the ALJ found that Garcia's "medically

determinable impairments could reasonably be expected to cause the alleged

symptoms[,]" but the ALJ also concluded that Garcia's "statements concerning the

intensity, persistence[,] and limiting effects of these symptoms are not entirely

11

consistent with the medical evidence and other evidence in the record . . . ."  AR
at 27.

At step five, the ALJ determined that, although Garcia was unable to
perform past relevant work, there was work available to Garcia that exists in
significant numbers in the national economy.  AR at 31-32.  Specifically, the ALJ
identified "kitchen helper", "cook helper", and "laundry worker" as positions
compatible with Garcia's RFC.  AR at 32.

On November 2, 2018, the same date as the ALJ's decision, Garcia
requested review by the Appeals Council.  AR at 298-99.  In a Notice dated May
31, 2019, the Appeals Council notified Garcia of its decision to decline to review
the ALJ's decision.  AR at 1-6.  The Appeals Council stated in this Notice that it
had determined that medical evidence submitted by Garcia from UConn Health
dated April 17, 2017, through September 15, 2018, did not show a reasonable
probability of changing the outcome of the ALJ's decision.  AR at 2.  Garcia
subsequently filed this Action.

### III.  STANDARD

To determine whether a claimant is disabled within the meaning of the Social
Security Act, the ALJ follows a five-step evaluation.  At the first step, the Commissioner
considers whether the claimant is currently engaged in substantial gainful activity.  If
not, the Commissioner proceeds to the second step and considers whether the claimant
has a "severe impairment" which limits his or her mental or physical ability to do basic
work activities.  If the claimant has a "severe impairment," the Commissioner proceeds
to step three and asks whether, based solely on the medical evidence, the claimant has

12

an impairment listed in Appendix 1 of the regulations.  See 20 C.F.R. § 416.920(a)(4).  If

the claimant has one of these enumerated impairments, the Commissioner will

automatically consider that claimant disabled, without considering vocational factors

such as age, education, and work experience.  Id.

 If the impairment is not "listed" in the regulations, the Commissioner proceeds to

step four and asks whether, despite the claimant's severe impairment, he or she has the

residual functional capacity to perform past work.  At step five, the Commissioner

determines whether there is other work the claimant could perform.  Id. To be

considered disabled, an individual's impairment must be "of such severity that he is not

only unable to do his previous work but cannot . . . engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).  The Commissioner bears the burden of proof on the fifth step, while the

claimant has the burden on the first four steps.  See 20 C.F.R. § 416.920(a)(4).

 The court's review of the Commissioner's decision "is limited to determining

whether the SSA's conclusions were supported by substantial evidence in the record

and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d

Cir. 2013) (per curiam) (citation omitted); see 42 U.S.C. § 405(g).  "Substantial

evidence" requires "more than a mere scintilla of evidence.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.

(quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

 Misapplication of the "treating physician rule" constitutes a legal error requiring a

remand.  Estrella v. Berryhill, 925 F.3d 90, 96-98 (2d Cir. 2019).  Further, because

"[c]ycles of improvement and debilitating symptoms of mental illness are a common

occurrence, [ ] in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."  Id. at 97 (citation and brackets omitted); see also Stacey v. Comm'r of Soc. Sec. Admin., 799 F. App'x 7, *10 (2d Cir. 2020) ("[Plaintiff] occasionally being in a good mood does not undermine the conclusion that he is severely limited in social interactions.").

## IV.   DISCUSSION

### A.   Analysis of Physical Impairments

Garcia first challenges the ALJ's analysis of Garcia's physical impairments, arguing that the ALJ erred at step two by finding certain of Garcia's physical impairments to be nonsevere, that the aspects of Garcia's RFC relating to Garcia's physical impairments are not supported by substantial evidence, that the ALJ erred in its weighing of medical evidence relating to Garcia's physical impairments, and that the ALJ erred by discounting Garcia's statements regarding the severity of her physical impairments.  Pl.'s Mot. at 15-18, 23, 26-33.

The court concludes that substantial evidence supports the ALJ's determinations concerning Garcia's physical impairments.  Confronted with multiple medical reports describing Garcia's physical impairments as mild or moderate, Garcia's self-reports of severe pain, and the absence of an opinion by a treating physician corroborating Garcia's self-reports, the ALJ was within his discretion to find that Garcia's physical impairments are not disabling.  See Bistek v. Berryhill, 139 S. Ct. 1148, 1154 (2009) (observing that the substantial evidence standard is "not high").

With respect to the ALJ's analysis at step two, Garcia argues that the ALJ erred "by finding that Garcia's knee, shoulder[,] and hand impairments were nonsevere."  Pl.'s Mot. at 15.  Notably, the ALJ did find that three of Garcia's physical impairments--degenerative disc disease of the lumbar spine, spondylosis of the lumbar spine, and spondylosis of the cervical spine with congenital incomplete segmentation--were severe.  AR at 18.  Garcia also states that "[b]eing able to use your hands does significantly impinge on basic work activity."  Id. at 17.  The court does not disagree with this statement in general, but the issue here is whether there is substantial evidence in support of the ALJ's finding that some of Garcia's physical impairments, though limiting to some extent, are not severe.  The court concludes that the record does contain such evidence, including the November 2014 MRI indicating "mild degenerative changes in the right knee, including mild medial compartment narrowing", AR at 455, the February 2016 MRI indicating "minimal degenerative arthritis" in Garcia's right shoulder, AR at 461, and Dr. Dodenhoff's consultative report indicating, inter alia, that Garcia walked with a "slight limp" and that her grip strength, as well as her fine and gross manipulation with her hands, were within a normal range, AR at 552-53.

Next, Garcia argues that the ALJ erred by stating in Garcia's RFC that Garcia can frequently climb ramps/stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance, stoop, kneel, and crouch; and occasionally crawl.  Pl.'s Mot. at 17-18; AR at 21.  Garcia contends that these abilities are inconsistent with Garcia's status as "a 50-year-old with problems with her low[er] back, neck, both shoulders and at least one bum knee."  Pl.'s Mot. at 18.

As with Garcia's first argument, however, the issue is whether substantial evidence supports the ALJ's determination.  The court concludes that the record contains such evidence, including Dr. Dodenhoff's assessment that Garcia can "sit, stand, walk, [and] lift, carry[,] and handle objects", AR at 553, and Dr. Sakalkale's September 2018 report, which describes Garcia's "gait [as] normal and appearing pain-free", notes some "reproduction of pain" when Garcia bends her spine, and recommends "conservative treatment options including medications [and] physical therapy, as well as interventional pain management techniques such as epidural steroid injections/facet joint injections to further optimize pain relief", AR at 908-09.

Lastly, Garcia challenges the ALJ's weighing of certain reports.  Garcia contends that the ALJ erred by giving great weight to the determination made by agency expert Dr. J. DeBorja that Garcia is capable of performing medium exertion work.  Pl.'s Mot. at 33.  This was not error.  Although, as Garcia points out, Dr. DeBorja did not have the benefit of all Garcia's MRIs, he did review records that post-date Garcia's amended alleged onset date.  See AR at 152-54.  Additionally, the ALJ determined that additional limitations were warranted beyond those identified by Dr. DeBorja.  See AR at 29.

Garcia also argues that the ALJ erred by failing to mention a "Physical Capacities Evaluation Worksheet," submitted in connection with Garcia's DSS application, which indicates that Garcia can occasionally lift and carry objects weighing between six and ten pounds and that she can never lift or carry objects weighing more than ten pounds. AR at 648.  The Second Circuit has observed, however, that "[a]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [a reviewing court] to glean the rationale of an ALJ's decision."  See Cichocki v. Astrue,

16

729 F.3d 172, 178 n.3 (citation and internal quotation marks omitted).  The court

concludes that it was not necessary for the ALJ to consider expressly this worksheet,

which contains no narrative section, lists no diagnoses, bears Garcia's signature on the

"Physician Signature" line, and bears the stamp of Muhammad Zubaiki, APRN, who is

not an acceptable medical source for the purposes of Garcia's application.  See

Definitions for this Subpart, 20 C.F.R. § 404.1502(a)(7) (2017) (recognizing licensed

advanced practice registered nurses as acceptable medical sources "only with respect

to claims filed . . . on or after March 27, 2017"); Medical and Other Evidence of Your

Impairment(s), 20 C.F.R. § 404.1513(a) (effective Sept. 3, 2013 to Mar. 26, 2017)

(omitting licensed advanced practice registered nurses from the list of acceptable

medical sources).

　　　　Finally, with respect to Garcia's self-reports in her testimony regarding the extent

of her pain, substantial evidence including the materials discussed above in connection

with Garcia's challenge to the RFC also supports the ALJ's determination not to credit

Garcia's subjective complaints concerning the severity of her pain.  The Second Circuit

has observed that "the ALJ is required to take the claimant's reports of pain and other

limitations into account . . . but is not required to accept the claimant's subjective

complaints without question; he may exercise discretion in weighing the credibility of the

claimant's testimony in light of the other evidence in the record."  Genier v. Astrue, 606

F.3d 46, 49 (2d Cir. 2010) (citations omitted).

B.    <u>Analysis of Mental Impairments</u>

Garcia's chief complaint concerning the ALJ's analysis of her mental impairments is that the ALJ violated the treating physician rule.  Part 404.1527 of title 20 of the Code of Federal Regulations governs the evaluation of opinion evidence for disability claims which, like Garcia's claims, were filed before March 27, 2017.   Evaluating Opinion Evidence for Claims Filed Before Mar. 27, 2017, 20 C.F.R. § 404.1527 (2017); <u>see</u> AR at 159 (reflecting filing date of Mar. 23, 2016).  Subsection (c)(2) sets forth what has become known as the treating physician rule.  This subsection provides, in relevant part, that "[i]f we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  <u>Id.</u> (c)(2).

The Second Circuit has interpreted this version of the treating physician rule as establishing a two-step test.  At the first step, "the ALJ must decide whether the opinion is entitled to controlling weight" under subsection (c)(2).  <u>Estrella</u>, 925 F.3d at 95.  "The opinion of a claimant's treating physician as to the nature and severity of an impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'"  <u>Id.</u> (brackets omitted) (quoting <u>Burgess v. Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008)).

 At the second step, "if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it."  <u>Id.</u>  "In doing so, it must 'explicitly consider' the following, nonexclusive '<u>Burgess</u> factors': (1) the frequency,

length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" Id. at 95-96 (quoting Selian, 708 F.3d at 418) (brackets omitted).

Under the Second Circuit's approach, "[a]t both steps, the ALJ must give good reasons in its notice of determination or decision for the weight it gives the treating source's medical opinion." Id. at 96 (emphasis added) (brackets and internal quotation marks omitted) (citing Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)). Thus, failure to provide good reasons at either step is cause for a remand. See id.

In Estrella v. Berryhill, the Second Circuit considered the application of the treating physician rule to claims based on mental impairments and, specifically, to circumstances where an ALJ perceives "apparent longitudinal inconsistencies in [a claimant's] mental health." 925 F.3d at 97. The ALJ in that case gave little weight to the opinion of the claimant's treating psychiatrist on the ground that the psychiatrist's opinion was inconsistent with records created by the same psychiatrist indicating that "most of [the claimant's] mental status examinations were normal", that "there was no evidence of cognitive limitations or psychosis", and that the claimant's Global Assessment of Functioning "scores had been consistently at 70, which indicated mild depression, not marked depression." Id. (brackets omitted).

In concluding in Estrella that the ALJ erred in giving little weight to the treating psychiatrist's opinion, though not in declining to give controlling weight to the opinion, the Second Circuit warned against giving unduly great weight to instances of mild symptoms when assessing claims related to mental impairment. Id. at 97-98. As the

panel explained, "[c]ycles of improvement and debilitating symptoms of mental illness are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."  Id. (citations and brackets omitted).

More recently, the Second Circuit applied the approach of the Estrella decision in its summary order for Stacey v. Commissioner of Social Security Administration.  799 F. App'x at *8-10.  In that case, the ALJ gave little weight to the opinion of the claimant's treating psychologist "that [the claimant] would be 'off-task' for more than 15% of the workday."  Id. at *8.  The ALJ justified this determination on the grounds that the opinion was inconsistent with positive treatment notes and that the opinion "was based largely on [the claimant's] self-reported symptoms, rather than on diagnostic testing."  Id. at *9.

The Second Circuit reversed and remanded for calculation of benefits, concluding that the ALJ's determination at step one of the treating physician rule "was not supported by substantial evidence."  Id.  With regard to the treatment notes, the panel reasoned that there was in fact "no contradiction here", because the claimant "occasionally being in a good mood does not undermine the conclusion that he is severely limited in social interactions."  Id. at *10.

Here, Garcia argues that the ALJ violated the treating physician rule in connection with his analysis of Garcia's mental impairments when he assigned partial weight to the April 2016 questionnaire signed by social worker Diaz and Dr. Kryspin and little weight to the June 2018 questionnaire signed only by Diaz.  Pl.'s Mot. at 19.  The version of the treating physician rule codified at part 404.1527 of title 20 of the Code of

20

Federal Regulations, however, only applies to "acceptable medical sources", 20 C.F.R.
§ 404.1527(a), and Diaz is not an acceptable medical source for the purposes of
Garcia's application, 20 C.F.R. § 404.1502(a)(7); 20 C.F.R. § 404.1513(a) (effective
Sept. 3, 2013 to Mar. 26, 2017).  Therefore, the court rejects Garcia's argument
concerning the treating physician rule in connection with the June 2018 questionnaire
signed only by Diaz.

With respect to the April 2016 questionnaire signed by both Diaz and Dr. Kryspin,
the Commissioner does not contest the applicability of the treating physician rule.  See
Def.'s Mot. at 6.  The ALJ, for his part, did not expressly confront whether the rule
applies to the April 2016 questionnaire.  The ALJ did, however, describe the
questionnaire as "completed" by Diaz and "also co-signed by Dr. Kryspin", perhaps
implying that the ALJ understood the treating physician rule not to apply, on the ground
that the questionnaire was not completed by Dr. Kryspin.  See AR at 29.

The court determines that, given the information currently in the record, the
treating physician rule does apply to the April 2016 questionnaire.  Dr. Kryspin is an
acceptable medical source, and she treated Garcia--indeed, section 4 of the April 2016
questionnaire indicates that Dr. Kryspin prescribed the medications Seroquel and
Lexapro to Garcia.  AR at 510.  It is possible that Diaz completed the questionnaire
independently of Dr. Kryspin and that Dr. Kryspin's signature on the "Co-Signature" line
of the questionnaire indicates minimal involvement.  The report does indicate that Diaz
was responsible for "mental status or psychological testing" associated with Section 7.
AR at 511.  On the current record, however, the fact remains that the questionnaire is
an opinion document signed by both a medically acceptable treating source and a

21

licensed social worker.  In the absence of facts in the record indicating that, despite Dr.

Kryspin's signature and role prescribing medications to Garcia, the 2016 questionnaire

is not "from" Dr. Kryspin in the sense contemplated in part 404.1527, the court

concludes that the treating physician rule applies to the 2016 questionnaire.

The ALJ did not separate its analysis of the 2016 questionnaire into the two steps

of the treating physician rule, and so the court treats the ALJ's reasons for assigning

partial weight to the questionnaire as the ALJ's reasons for both steps.  See AR at 30;

Estrella at 96 ("At both steps, the ALJ must 'give good reasons in [its] notice of

determination or decision for the weight [it gives the] treating source's [medical]

opinion.'" (quoting Halloran, 362 F.3d at 32)).  The ALJ's stated reasons are as follows:

> Mr. Diaz indicated good response to talk therapy and medication which
> prevented hospitalization.  [Garcia] was described as casual, neat and
> appropriate as well as oriented x4.  She was able to count backwards and stated
> the months in reverse.  Speech was normal, coherent and articulate.  This
> examination, however, does not support the opinion finding frequent problems
> with the ability to focus long enough to finish simple activities/tasks, performing
> basic activities at a reasonable pace or in the ability to persist in simple activities
> without interruption from psychological symptoms as well as with getting along
> with others without distracting them or exhibiting behavioral extremes.

AR at 30.  In other words, the ALJ determined that, notwithstanding the questionnaire's

report of auditory and visual hallucinations and hypervigilance, positive aspects of

Garcia's assessment of status were inconsistent with the opinions expressed in the

questionnaire concerning Garcia's social and task performance capabilities.  See AR at

30, 510-13.

The court concludes that the ALJ's reasons are inadequate at both steps of the

treating physician rule and that a remand is required.  At the first step of the treating

physician rule, the positive impressions of certain aspects of Garcia's mental status in

the questionnaire are not inconsistent with the conclusions in the questionnaire concerning the extent to which Garcia's mental impairments would interfere with her ability to function in the workplace.  As the Second Circuit's opinion in Estrella and summary order in Stacey illustrate, an ALJ's reason for discounting a treating physician's opinion regarding a claimant's mental impairment must be responsive to the nature of the claimant's impairment.  Estrella, 925 F.3d at 97 (concluding that ALJ failed to account for cyclical nature of claimant's mental impairment); Stacey, 799 F. App'x at *9-10 (rejecting ALJ's determination that evidence of positive familial interactions undermined treating psychologist's opinion that claimant experienced "extreme difficulties interacting appropriately with coworkers and members of the public").  Likewise, the fact that Garcia--in clinical settings--appeared "casual, neat[,] and appropriate", spoke in a "normal, coherent, articulate" manner, and was able to count backwards is not inconsistent with Diaz and Dr. Kryspin's determination that Garcia's symptoms of PTSD and schizophrenia, including auditory and visual hallucinations, would interfere with Garcia's ability to interact socially and perform tasks.  See AR at 511-13.  Nor is the ALJ's observation that Garcia's treatment plan prevented hospitalization.  See AR at 27-28.

At the second step of the treating physician rule, the ALJ erred by failing to consider "explicitly" the frequency, length, nature, and extent of the treatment Dr. Kryspin provided and Dr. Kryspin's specialized expertise.  See Estrella, 925 F.3d at 96 (noting that an ALJ errs by failing to "'explicitly' apply the Burgess factors when assigning weight at step two" (quoting Selian, 708 F.3d at 419-20)).  A remand is not necessary at step two of the treating physician rule if "a searching review of the record

assures [the court] that the substance of the treating physician rule was not traversed

. . . ."  Id. (citation and internal quotation marks omitted).  Here, such a review fails to

assure the court that the physician treating rule was not traversed, for the same reason

that the court determines the ALJ erred at step one of the rule.  The fact that Garcia

exhibited some positive indicators at treatment and evaluation sessions is not

inconsistent with the opinion expressed in the questionnaire that Garcia's symptoms

associated with PTSD and schizophrenia would significantly limit her ability to interact

socially and perform tasks.  See Estrella, 925 F.3d at 97; Stacey, 799 F. App'x at *9-10.

Further, the court's review of the record reveals other instances in which the ALJ,

without citation to medical authority, relied on positive aspects of Garcia's mental status

in order to minimize her reports of hallucinations.  See, e.g., AR at 25 ("[Garcia]

reported to Mr. Diaz, on April 20, 2017, the ongoing presence of auditory and visual

hallucinations associated with traumatic experiences at night.  However, the remainder

of the mental status exam was unremarkable.").  These are precisely the types of

"cherrypicked treatment notes" that the Second Circuit has held "do not provide 'good

reasons' for minimalizing [a treating physician's] opinion.  Estrella, 925 F.3d at 97.

Garcia also challenges the ALJ's weighing of other evidence pertaining to

Garcia's mental impairments.  See Pl.'s Mot. at 22-32.  Given the court's determination

that a remand is required on account of the ALJ's violation of the treating physician rule,

the court declines to address these issues.  The court does, however, admonish the

ALJ to heed--during his assessment of all evidence pertaining to Garcia's mental

impairments--the Second Circuit's rule against cherry-picking treatment notes

concerning mental impairments, as well as the court's conclusion in this case that

positive aspects of Garcia's mental status examinations are not substantial evidence inconsistent with Garcia's reports of hallucinations and their impact on her ability to function.

The court also notes its concern that the ALJ may have implied that Garcia is malingering with respect to the occurrence or severity of her reported hallucinations. See AR at 28 ("Likewise, her mental status examinations reveal few abnormalities other than perceptual disturbances, but not evidenced during exams, and anxious mood at times." (emphasis added)).  The Second Circuit has warned that an "ALJ cannot arbitrarily substitute his own judgment for competent medical opinion."  Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citations omitted).  The record before the ALJ contains no medical reports suggesting that Garcia is malingering.  To the contrary, the record contains many reports discussing Garcia's hallucinations, including the report by consultative examining psychologist Harvey, Psy.D., in connection with Garcia's DSS application, which describes Garcia as "a reliable informant of information" and as exhibiting "marked peculiarities in thinking and experiences, often associated with an active psychotic episode."  AR at 559.  In the absence of evidence discounting Garcia's reports of hallucinations, it would be error if the ALJ were to conclude or imply that Garcia is malingering.

## V.    CONCLUSION

For the reasons stated above, the court vacates the ALJ's decision and remands for further proceedings, thereby denying the Commissioner's Motion for an Order Affirming the Commissioner's Decision (Doc. No. 15) and denying in part Garcia's Motion for Order (Doc. No. 13), insofar as Garcia's Motion seeks an order reversing the

ALJ's decision.  The Clerk's Office is instructed that, if any party appeals to this court

the decision made after this remand, any subsequent social security appeal is to be

assigned to the District Judge who issued this Ruling.

**SO ORDERED.**

Dated this 8th day of September 2020 at New Haven, Connecticut.


  /s/ Janet C. Hall
Janet C. Hall
United States District Judge